IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 19-79 |
| | : | |
| IVAN JAMES (1) | : | |
| | : | |
| KAI JAMES (2) | : | |
| | : | |
| JOH WILLIAMS (3) | : | |
| | : | |
| MALACHI BENJAMIN (4) | : | |
| | : | |
| JAHKIEBO JOSEPH (6) | : | |
| | : | |
| ARIEL PETERSEN (7) | : | |

## <u>MEMORANDUM OPINION</u>

Smith, J.                                                                  June 14, 2023

There are two issues presently before the court. First, a subset of defendants move to dismiss several counts of the operative indictment, arguing that the statute on which the charges are based is unconstitutional. Second, all of the defendants move to compel the government to immediately disclose the identity of several confidential informants. The court will deny both motions.

In August 2022, a grand jury returned a second superseding indictment charging three individuals with, *inter alia*, five counts under 18 U.S.C. section 922(a)(5) for unlawfully transferring firearms to a person not being a licensed importer, manufacturer, dealer, or collector of firearms. One of the defendants has filed a motion asking the court to dismiss these five counts of the indictment, arguing that the statute is unconstitutional because it infringes on the rights of citizens to keep and bear arms protected under the Second Amendment.

Courts must conduct a two-step analysis in evaluating whether a statute withstands a challenge under the Second Amendment. First, the court must determine whether the Second Amendment's plain text covers the regulated conduct and if it does, the Constitution presumptively protects that conduct. At step two, the government must affirmatively justify the regulation by demonstrating that the modern law is consistent with this Nation's historical tradition of firearm regulation. The government must meet this burden by presenting historical analogues that are sufficiently relevant to show that the modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.

The defendants' challenge fails at step one. The statute in question places conditions and qualifications on the transfer of arms between unlicensed individuals, and does not limit the ability for an individual to obtain a firearm within the jurisdiction lawfully. Based on the Second Amendment's core purpose, the right to armed self-defense in case of confrontation, this regulation does not fall within the ambit of the Amendment's plain text. Even if the court were to come to a contrary conclusion at step one, there are sufficient historical analogues to the regulated conduct to show that the modern regulation imposes a burden within the scope of the Second Amendment as understood to the people when the amendment was adopted. Accordingly, the court will deny the motion to dismiss counts five through ten of the second superseding indictment.

Second, the defendants move to compel the government to immediately disclose the identities of various confidential informants. The government has the privilege to withhold the identity of confidential informants that they intend to call to testify until the eve of trial. Here, the government has that right and no evidence has been adduced to show that any exceptions to this rule are applicable. Even applying the balancing test cited by the defendants, the factors weigh in favor of non-disclosure. Accordingly, the court will also deny the defendants' motion to compel.

## I.    PROCEDURAL HISTORY

A grand jury issued an indictment on December 18, 2019, changing five defendants—Ivan James, Kai James, Joh Williams, Malachi Benjamin, and Tallisa Ceaser[1]—with eight counts of drug trafficking, conspiracy, and possession of a firearm in furtherance of the drug trafficking conspiracy. *See* Indictment at 1–7, Doc. No. 1. The grand jury issued a twenty-count superseding indictment on January 30, 2020, adding two defendants, Jahkiebo Joseph and Ariel Petersen. *See* Doc. No. 48. On August 11, 2022, the grand jury returned a twenty-three count second superseding indictment. *See* Second Superseding Indictment, Doc. No. 313.

Counts five through ten of the second superseding indictment charged three defendants, Kai James, Jahkiebo Joseph, and Ariel Petersen under 18 U.S.C. sections 922(a)(5) and 942(a)(1)(D). *See* Second Superseding Indictment at 3–6. On October 24, 2022, defendant Ariel Petersen ("Petersen") moved to dismiss these counts, arguing that section 922(a)(5) is unconstitutional on its face and, in the alternative, as applied because it conflicts with the Second Amendment.[2] *See* Mot. to Dismiss at 13, Doc. No. 353. On December 30, 2022, the government filed a response in opposition to Petersen's motion to dismiss. Doc. No. 385. Petersen filed a reply to the government's response on January 31, 2023. Doc. No. 407. Petersen later filed two notices of supplemental authority. Doc. Nos. 412, 480. On April 4, 2023, the court held a hearing on all outstanding motions, including Petersen's motion to dismiss.

During the hearing on the motion to change vicinage, the government presented testimony from three witnesses who work with the confidential informants on the instant case. These witnesses testified that the confidential informants would fear for their safety and the safety of their families if the trial were to be held in St. Croix and they were called to testify. After the government presented this testimony, the defendants orally moved to compel disclosure of the

---

[1] Tallisa Ceaser has since pled guilty. *See* Doc. No. 294.
[2] Ivan James filed a motion to join Petersen's motion to dismiss. However, he is not charged in counts five through ten.

identities of the confidential informants. The court denied the request. The defendants jointly requested leave to file a motion to compel, which the court granted. On April 5, 2023, defendant Jahkiebo Joseph ("Joseph") filed a motion to compel disclosure.[3] *See* Doc. No. 475. On April 26, 2023, the government filed a response in opposition to the motion to compel. *See* Doc. No. 490. Both motions are now ripe for review.

## II.    SUMMARY OF THE OPERATIVE INDICTMENT

The second superseding indictment charges twenty-two counts against a total of seven defendants. Three of the defendants, Kai James, Joseph, and Petersen are charged with, *inter alia*, five counts of transferring ten total firearms to unlicensed residents of states other than their own without having a license to do so, in violation of 18 U.S.C. sections 922(a)(5) and 924(a)(1)(D). *See* Second Superseding Indictment at 3–6. In whole, section 922(a)(5) states:

**(a)** It shall be unlawful—

> **(5)** for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(a)(5). 18 U.S.C. section 924(a)(1)(D) states:

**(a)**

> **(1)** Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever—

> **(D)** willfully violates any other provision of this chapter,

---

[3] On April 10, 2023, defendant Kai James filed a motion to join the motion to compel. *See* Doc. No. 481. That same day, defendant Ariel Petersen filed a notice of joinder to join the motion to compel. *See* Doc. No. 483. On April 27, 2023, the court granted Kai James' motion for joinder. *See* Doc. No. 492.

shall be fined under this title, imprisoned not more than five years, or both.

18 U.S.C. § 924(a)(1)(D).

Count 5 charges three defendants, Kai James, Joseph, and Petersen with conspiracy to transport five firearms to Jason Freeman, a person not being a licensed importer, manufacturer, dealer, and collector of firearms while knowing and with reasonable cause to believe that he did not reside in St. Croix, in violation of 18 U.S.C. sections 922(a)(5) and 924(a)(1)(D). *See* Second Superseding Indictment at 3. The firearms allegedly transferred are (1) a Smith & Wesson, 9 Millimeter Handgun with the serial number HPP3181; (2) a Smith & Wesson, 9 Millimeter Handgun with the serial number HSR3500; (3) a Glock 22, .40 Caliber Handgun with the serial number BDUN801; (4) a Glock 19, 9 Millimeter Handgun with the serial number RYF733; and (5) a Colt Sporter .223 Caliber, AR-15 Rifle with a serial number MH064994. *See id.* Counts 6–10 charge the same three defendants under the same statutes, alleging they transferred the above-listed firearms to the same unlicensed individual, each count involving a separate firearm. *See id.* at 3–6.

### III.    DISCUSSION

Petersen filed a motion to dismiss counts five through ten of the second superseding indictment. Joseph filed a motion to compel disclose of the identity of the government's confidential informants. The court will address each motion in turn.

#### A.    Motion to Dismiss and the Second Amendment

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. In the home, "the need for defense of self, family, and property is most acute." *Id.* at 628. But this right extends past the walls of one's home. *See New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022). In *Bruen*, the Court reaffirmed *Heller* and

*McDonald v. Chicago*, 561 U.S. 742 (2010) and held that the Second Amendment presumptively guarantees law-abiding, responsible citizens the right to bear arms for self-defense in public. *See id.* at 2122 ("We . . . now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."); *see also id.* at 2135 ("[T]he Second Amendment guarantees an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home.") (internal citation and quotation marks omitted). "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). The right protected by the Second Amendment allows for a variety of gun regulations. *Bruen*, 142 S. Ct. at 2133. ("[T]he Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."). Included in the category of presumptively lawful gun regulations are "laws imposing conditions and qualifications on the commercial sale of arms."[4] *Id.* at 626–27, 627 n.26.

In light of these decisions, Petersen moves to dismiss counts five through ten of the second superseding indictment. He claims that, under the Second Amendment, section 922(a)(5) is facially unconstitutional and in the alternative, that section 922(a)(5) is unconstitutional as applied. For the reasons discussed below, the court will deny Petersen's motion to dismiss.

### 1.   *Bruen*'s Analytical Framework

---

[4] The Supreme Court also listed "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as presumptively lawful. *Heller*, 554 U.S. at 626. The Court noted that this list of presumptively lawful regulatory measures "does not purport to be exhaustive." *Id.* at 627 n.26. The Court did not, and has not, provided a singular reason behind *why* these regulations are presumptively lawful. The Second Circuit Court of Appeals hypothesized—in a pre-*Bruen* opinion—that "the natural explanation is that time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment rights." *See United States v. Decastro*, 682 F.3d 160, 165 (2d Cir. 2012) (reviewing *Heller*'s guidance permitting prohibitions on carrying firearms in sensitive places). In *Bruen*, the Court analyzed the longstanding laws prohibiting the carrying of firearms into sensitive places, reasoning that the restrictions prohibiting carrying of firearms into sensitive places is consistent with historical regulations. 142 S. Ct. at 2133.

Prior to *Bruen*, courts in the Third Circuit Court of Appeals—similar to courts throughout the country—applied a two-step framework for analyzing Second Amendment challenges that combined historical analysis with means-end scrutiny. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (detailing two-step analysis developed under *Heller*); *see also Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 346 (3d Cir. 2016) (en banc) (noting nearly every court of appeals had cited Third Circuit's two step approach favorably). In *Bruen*, the Court set out a new standard under which lower courts should analyze regulations under the Second Amendment.[5] 142 S. Ct. at 2129–30; *see also United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (examining *Bruen*'s two analytical steps).

First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct" and if it does, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. If the conduct does fall within the Second Amendment's plain text, the government must demonstrate that the "regulation is consistent with this Nation's historical tradition of firearm regulation" to justify the regulation. *Id.* In other words, if "the Second Amendment's plain text covers an individual's conduct," then the only way to justify the challenged regulation, is for "the government [to] affirmatively prove that its firearms regulation

---

[5] In *Range v. Att'y Gen. U.S.*, the Third Circuit briefly summarized the pre-*Bruen* analytical framework:

> At the first step, we considered whether the challenged law burdened conduct within the scope of the Second Amendment. *Marzzarella*, 614 F.3d at 89. In examining this subject, we observed that "the right to bear arms was tied to the concept of a virtuous citizenry and that accordingly, the government could disarm 'unvirtuous citizens[,]' including "any person who has committed a serious criminal offense, violent or nonviolent." *Binderup*, 836 F.3d at 348 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)); *see also Heller*, 554 U.S. at 626–27 & n.26, 128 S. Ct. 2783. If the first step was met, we proceeded to the second step and assessed whether the regulation withstood means-end scrutiny. *Marzzarella*, 614 F.3d at 89.

53 F.4th 262, 269 (3d. Cir. 2022) (per curiam) (footnote omitted) ("*Range I*"), *vacated, reh'g en banc granted,* 56 F.4th 992 (3d Cir. 2023). In *Bruen*, the Court specifically rejected using means-end scrutiny as the second step; instead requiring the government to prove that a challenged firearm regulation is in line with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). In *Range I*, the Third Circuit recognized that *Bruen* abrogated the circuit's previous two-part test. *Range I*, 53 F.4th at 269.

is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6]

*Id.* at 2126–27.

At step two, the government carries the burden to prove that there is a historical analogue

for the modern regulation. *See id.* at 2127. In *Rahimi*, the Fifth Circuit Court of Appeals analyzed

step two, explaining that:

> To carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." [*Bruen*, 142 S. Ct.] at 2131–32 (internal quotation marks omitted). "[W]e are not obliged to sift the historical materials for evidence to sustain [the challenged statute]. That is [the Government's] burden." *Id.* at 2150.

> The Government need not identify a "historical twin"; rather, a "well-established and representative historical analogue" suffices. *Id.* at 2133. The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: how the challenged law burdens the right to armed self-defense, and why the law burdens that right. *Id.* (citing *McDonald*, 561 U.S. at 767, 130 S. Ct. 3020, and *Heller*, 554 U.S. at 599, 128 S. Ct. 2783). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations

---

[6] The parties disagree on whose burden it is to show if a statute falls within the plain text of the Second Amendment. *Compare* United States' Opp'n to the Mot. to Dismiss Counts Five Through Ten ("U.S. Opp'n to Mot. to Dismiss") at 4, Doc. No. 385 ("[The Supreme Court] implied that the party challenging a firearm regulation bears the initial burden."), *with* Reply re: Mot. to Dismiss ("Petersen's Reply") at 1, Doc. No. 407 ("The government bears the burden of showing that the text does not apply here."). In *Bruen*, the Court stated that:

> [T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961). At step two, the government clearly bears the burden. *See id.* But it is unclear which party bears the burden at step one. *See id.* The Court analogizes this framework to that of the First Amendment. *Id.* at 2130. Looking to the Court's First Amendment jurisprudence, the individual challenging the constitutionality of a regulation carries the burden of showing that the regulation implicates the rights protected by the First Amendment. *See, e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); *Harmon v. City of Norman*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct."); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). As the Court stated, the Second Amendment should not be "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (citation and quotation marks omitted). Similarly, like challenges to a regulation under the First Amendment, the court finds that the party challenging a regulation under the Second Amendment bears the burden to show that the plain text covers the prohibited conduct. *See id.*

> when engaging in an analogical inquiry." *Id.* (internal quotation marks and emphasis omitted).

61 F.4th at 454; *see also Nat'l Rifle Assoc. v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023) ("First, we consider the plain text of the Amendment, as informed by the historical tradition. Second, we look for a historical analogue—not a historical 'dead ringer,' . . . of the challenged law.") (quoting *Bruen*, 142 S. Ct. at 2118) (citation omitted). Thus, to survive review, the challenged firearm regulation must be rooted in the Nation's historical tradition of firearm regulation; but there need not be an identical historical statute. *Bruen*, 142 S. Ct. at 2133. The Supreme Court highlighted two metrics to consider when determining whether a regulation has a relevantly similar historical analogue: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[7] *Id.* at 2132–33.

   This second step requires courts to look at historical regulations to determine whether there is a sufficient historical analogue to demonstrate whether the modern regulation is consistent with this Nation's historical tradition of firearm regulation. *See id.* Courts must be careful when reasoning by analogy to focus on the correct applicable metric to determine whether a historical analogue is relevantly similar. *See id*. The Court provided guidance on whether a historical analogue is truly representative. *See id.* As the Court explained in *Bruen*:

---

[7]In *Bruen*, the Supreme Court repeatedly described the right protected by the Second Amendment as one belonging to law-abiding citizens. *See, e.g.*, 142 S. Ct. at 2122 (recognizing Second and Fourteenth Amendments protect the rights of "an ordinary, law-abiding citizen" to possess handgun for self-defense); *id.* at 2131 (noting Second Amendment protects "the right of law-abiding, responsible citizens" to armed self-defense); *id.* at 2133 (stating that inquiry into historical traditions should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *see also Range I*, 53 F.4th at 271–72, 272 n.11 (collecting fourteen instances in *Bruen* where the Court characterized holders of Second Amendment rights as "law-abiding" citizens); *Range*. In *Rahimi*, the Fifth Circuit understood that the term "'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, *i.e.*, groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." 61 F.4th 443 at 452 (quoting *Heller*, 554 U.S. at 627, n.26); *see also Range I*, 53 F.4th at 266 (holding that "the people" constitutionally protected by Second Amendment "excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses."); *Range v. United States*, No. 21-2835, 2023 WL 3833404, at *5–6 (3d Cir. June 6, 2023) ("*Range II*") (reviewing term "law-abiding" citizen in Supreme Court's Second Amendment decisions).

When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.*, at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." *See ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the central component' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S. Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S. Ct. 2783); see also id., at 628, 128 S. Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " 'central' " considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S. Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S. Ct. 2783).

*Bruen*, 142 S. Ct. at 2132–33. Thus, the court must compare the burden any modern regulation places on the right to armed self-defense with a proposed historical analogue. *Id.*

### 2.    Plain Text of the Second Amendment and 18 U.S.C. Section 922(a)(5)

The court first must determine whether Petersen has met his burden to show that the plain text of the Second Amendment covers the conduct prohibited by section 922(a)(5). Courts "are guided by the principle that [t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (citation and quotation marks omitted). The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *Heller*, the Supreme Court held that the normal and ordinary meaning of the Second Amendment is to guarantee an "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. "[T]he Second Amendment, like the First and Fourth Amendments, codified a preexisting right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'") (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)) (alteration in original). Moreover, the Second Amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]."[8] *Id.* at 634–35. In *Bruen*, the Court expanded the holdings of *Heller* and *McDonald*, stating "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *See id.* at 2122.

Reviewing the conduct prohibited by section 922(a)(5), the court will start with the statutory text. The relevant portion of the statute states:

**(a)** It shall be unlawful—

. . .

**(5)** for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business

---

[8] Presently, "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 142 S. Ct. at 2138. In *Bruen*, the Supreme Court declined to address the issue because the challenged law had insufficient historical analogs in either time period. *See id.* In *Bondi*, the Eleventh Circuit Court of Appeals Courts suggested that the Reconstruction Era sources should be given the most weight. 61 F.4th at 1321. There, the court analyzed a challenge to a Florida law and explained that historical sources from the Reconstruction Era were more probative to the Second Amendment's scope than those from the Founding Era because "the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Id.* at 1321–34. Like in *Bruen*, the court need not reach this issue in the instant motion.

entity, does not maintain a place of business in) the State in which the transferor resides[.]

18 U.S.C. § 922(a)(5).[9] The defendant argues that the statute burdens the right to keep and bear arms as it places restrictions on the acquisition of firearms. *See* Mot. to Dismiss at 14. The government argues that this statute does not prohibit conduct protected by the plain text of the Second Amendment because the statute is a commercial regulation that does not infringe on one's right to keep and bear arms. *See* U.S. Opp'n to Mot. to Dismiss at 8–9. The court finds that section 922(a)(5) is a commercial regulation and that the plain text of the Second Amendment does not cover the prohibited conduct.

In *Heller*, the Supreme Court stated that "laws imposing conditions and qualifications on the commercial sale of arms" are presumptively lawful regulatory measures. *See* 554 U.S. at 626–27, 627 n.26. In *McDonald*, the Court reiterated this assertion. *See* 561 U.S. at 786. And concurring in *Bruen*, Justice Alito clarified that the Court was not disturbing anything said in *Heller* or *McDonald* regarding "the requirements that must be met to buy a gun." 142 S. Ct. at 2157 (Alito, J. concurring). The Court provides little analysis as to why commercial regulations are presumptively lawful.

It appears that reasonable commercial regulations are presumptively valid because they do not implicate the "central component" of the Second Amendment, an individual's right of possession of a firearm for self-defense. *Heller*, 554 U.S. at 599; *see also Bruen*, 142 S. Ct. at 2161–62 (determining New York law to be constitutionally infirm when it effectively denies individuals right to carry handguns for self-defense) (Kavanaugh, J., concurring). Rather, laws

---

[9] Section 922(a)(5) continues, excepting certain transfers from its regulation. It states that "except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes. 18 U.S.C. § 922(a)(5).

imposing conditions and qualifications on the commercial sale of firearms fall outside the plain text of the Second Amendment because these laws primarily impact manufacturers, sellers, or transferers and do not criminalize possession of the firearm. *See United States v. Price*, No. 22-97 2022 WL 6968457, at *3 (S.D. W. Va. Oct. 12, 2022) (noting commercial regulations do not prohibit conduct protected by plain text of Second Amendment because they do not implicate individual right of possession); *United States v. James*, 172 F.3d 588, 593 (8th Cir. 1999) (reviewing section 922(a)(5) and explaining it criminalizes only unlicensed transfers of firearms, not possession).

Accordingly, section 922(a)(5) is a commercial regulation because it targets the transfer of the firearm and does not criminalize mere possession. *See Price*, 2022 WL 6968457, at *2–3 (finding challenged statute not to be commercial regulation when criminalizing possession). The statute prohibits unlicensed individuals to "transfer, sell, trade, give, transport, or deliver"[10] firearms to another unlicensed individual who resides in a different state than the state in which the transferor resides. 18 U.S.C. § 922(a)(5); *see United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (upholding section 922(a)(5) as constitutional pre-*Bruen*); *James*, 172 F.3d at 593 (clarifying section 922(a)(5) enumerates multiple ways a defendant could commit same offense). Black's Law Dictionary defines "transfer" broadly, including "[a]ny mode of disposing of or parting with an asset or an interest in an asset." *Transfer*, Black's Law Dictionary (11th ed. 2019) ("The term embraces every method — direct or indirect, absolute or conditional, voluntary or involuntary — of disposing of or parting with property or with an interest in property.").

---

[10] Petersen focuses primarily on the term "transport," while overlooking the other verbs in the statute. *See* Mot. to Dismiss at 2; Petersen's Reply at 5. This portion of the statutory text is meant to be inclusive, capturing all forms of transferring ownership of a firearm from one entity to another. Transporting a firearm is just one subset of transfers captured by section 922(a)(5).

The elements needed to convict a defendant under 922(a)(5) show that the statute is a commercial regulation, rather than a burden on the individual right to keep and bear arms. The four elements are:

> **(1)** the defendant was not a licensed firearms importer, manufacturer, dealer, or collector;
> **(2)** the defendant transferred, sold, traded, gave, transported, or delivered a firearm to another person;
> **(3)** the person to whom the defendant transferred the firearm was not a licensed importer, manufacturer, dealer, or collector; and
> **(4)** the defendant knew or had reasonable cause to believe that the person to whom the firearm was transferred did not reside in the defendant's state or residence.

*United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013). Three of the four elements require the government to prove that a transfer occurred. The statute does not aim to prohibit law-abiding citizens from keeping or bearing arms in case of conflict.

The Court's statements in *Heller*, *McDonald*, and *Bruen*, reinforce the conclusion that section 922(a)(5) is constitutionally sound. *See Price*, 2022 WL 6968457, at *2 ("This idea is rooted in *Heller* and *McDonald*—precedent that *Bruen* reaffirmed—which also left commercial regulations untouched."). As the Supreme Court stated in *Heller*, "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27; *see also McDonald*, 561 U.S. at 787 ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures."). Three of the six justices who signed the *Bruen* majority underscored the continued validity of this aspect of *Heller*. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.") *id.* at 2162; (Kavanaugh, J., concurring) (quoting *Heller* for proposition that "[n]othing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms.") (joined by Roberts, C.J.).

The Supreme Court stated that these regulatory prerequisites to acquiring firearms are presumptively lawful, so long as they do not act as to "deny ordinary citizens their right to public carry." *See id.* at 2138 n.9. Section 922(a)(5) does not prevent ordinary citizens from exercising their right to public carry. *See id.*; *see also United States v. Schwab*, 710 F. Supp. 419, 421 (D. Conn. 1989) (explaining section 922(a)(5) regulates interstate sale of firearms). The statute does not prevent qualified citizens from purchasing guns lawfully in the jurisdiction in which the reside or are visiting. *See Schwab*, 710 F. Supp. at 421. Rather, the statute prevents non-law-abiding citizens from circumventing reasonable commercial regulations.[11] *See id.*; *see also United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("[T]he prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms.").

Petersen argues that section 922(a)(5) is not a commercial regulation and falls within the plain text of the Second Amendment.[12] He points to *Price*, 2022 WL 6968457 to support this argument. In *Price*, the defendant challenged the constitutionality of 18 U.S.C. section 922(k), which prohibits possession of a firearm with the manufacturer's serial number removed or altered. *See id.* at *2. The government asserted that 922(k) was a commercial regulation and thus outside of the scope of *Heller*, *McDonald*, and *Bruen*. *Id.* The district court held that section 922(k) is not a commercial regulation. *See id.* at *3. The court reasoned that "commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession." *Id.* at *2.

---

[11] Moreover, section 922(a)(5) ensures that states are able to regulate firearm traffic within their borders. *See Schwab*, 710 F. Supp. at 421 (("The principal purposes of the 1968 gun control legislation were 'to strengthen federal controls over interstate and foreign commerce in firearms and to assist the states effectively to regulate firearms traffic within their borders.'") (citing H.R. Rep. No. 1577, at 4411 (1968)); *see also Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635) (approving shall-issue licensing regimes when they are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'").

[12] In his briefing, the defendant states "the Government has not alleged that the Defendant sold a firearm; instead, the Government alleged that the Defendant 'conspired, confederated, and agreed, to together with other persons, to transport firearms, … .'" Petersen's Reply at 5–6 (citing Second Superseding Indictment at 3). However, the defendant omits large portions of the indictment, including, *inter alia*, "at the time of the aforesaid *transfer* of the firearms." Second Superseding Indictment at 3 (emphasis added). When reading the five challenged counts in their entirety, the grand jury charged the defendants relating to the transfer of firearms, not just transportation. *Id.*

But section 922(k) went further than only applying to the manufacturers and sellers because it restricts the possession of the firearm, not just the transfer. *Id.* at *3.

Here, unlike in *Price*, section 922(a)(5) is only applicable to a transfer of a firearm. *See id.* Section 922(a)(5) does not create new prohibitions or restrictions on individuals from possessing firearms. Rather, it requires residents to purchase or acquire the firearms through the lawful restrictions imposed by their respective states. Section 922(a)(5) does not burden the possession of firearms but rather criminalizes the circumvention of lawful commercial regulations. *See Decastro*, 682 F.3d at 169 (upholding law which "attempts only to assist states in the enforcement of their own gun laws."). Under 922(a)(5), possession itself is insufficient to subject a defendant to criminal penalties. *Price* does not persuade the court that 922(a)(5) burdens the core function of the Second Amendment. *See* 2022 WL 6968457, at *2–3. The conduct prohibited by section 922(a)(5) does not fall within the plain meaning of the Second Amendment and is presumptively lawful.

At bottom, section 922(a)(5) does not infringe upon the Second Amendment's core purpose, the right to keep and bear arms for self-defense in case of confrontation. *See Focia*, 869 F.3d at 1286 ("[Section] 922(a)(5) only minimally affects the ability to acquire a firearm."). The statute imposes conditions or qualifications on inherently commercial activity, by requiring that the transfer of a firearm includes an individual licensed to sell or buy the firearm. *See Hosford*, 843 F.3d at 166. Moreover, section 922(a)(5) complements local commercial regulations, preventing individuals from sidestepping the lawful conditions and qualifications limiting the transfers of firearms within a jurisdiction. Because the challenged statute is a commercial regulation, it does not fall within the Second Amendment's plain text.[13] Having found that Section

---

[13] Although the Supreme Court left commercial regulations untouched, courts have found that the Second Amendment inherently protects the right of individuals to acquire firearms and ammunition, through lawful means. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (explaining prohibition on sale of ammunition burdened the

922(a)(5) does not implicate conduct protected by the Second Amendment, the statute is presumptively lawful.

### 3.    Historical Tradition of Regulating Transfers of Firearms

Even if the conduct prohibited by section 922(a)(5) were to fall within the plain text of the Second Amendment, the statute is consistent with this "Nation's historical tradition of firearm regulation" and is therefore constitutionally sound. *See Bruen*, 142 S. Ct. at 2135.

As discussed above, at step two, the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. This inquiry entails "reasoning by analogy" to determine whether historical firearms regulations are "relevantly similar" to the challenged regulation. *Id.* at 2132. This is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[14] *Heller*, 554 U.S. at 634–635 (emphasis in original); *see also Bruen*, 142 S. Ct. at 2136 (same).

Here, the government points to *Teixeira*, to highlight "well-established and representative historical analogue[s]" for section 922(a)(5). U.S. Opp'n to Mot. to Dismiss at 10–11. In *Teixeira*, the Ninth Circuit Court of Appeals reviewed a number of colonial laws and found that:

---

core rights protected by Second Amendment). "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Id.* at 677 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see also Fraser v. ATF*, No. 22-410, 2023 WL 3355339, at *7 (E.D. Va. May 10, 2023) ("Commonsense and logic tell us that, unless one is a maker of guns, the right to 'keep'/have a gun necessarily means that one must purchase it, steal it, be given it by another, or find one that another has lost.").

   But there is no constitutional right to transfer or sell firearms. *See United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016); *Fraser*, 2023 WL 3355339, at *8. Because section 922(a)(5) does not create an undue burden on the right to purchase a firearm, the court today need not delve deeply into the specific intersection of these two rights. But at some point, commercial regulations may infringe upon the right to purchase firearms. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (rejecting zoning ordinance severely restricting purchase firearms in township).

[14] As the Supreme Court explained in *Bruen*, historical sources explaining the scope of the Second Amendment should be given different weight depending on the time period from which they come. *See* 142 S. Ct. at 2135–36 (quoting *Heller*, 554 U.S. at 634–635. As the Second Amendment was adopted in 1791 and the Fourteenth in 1868, historical sources from these periods are most relevant. *Id.* at 2136. "Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.*

> [C]olonial government regulation included some restrictions on the commercial sale of firearms. In response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians. *See Acts of Assembly, Mar. 1657-8*, in 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 441 (1823); 1 J. Hammond Trumbull, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665*, at 49, 182 (1850); *Assembly Proceedings, February-March 1638/9, in Proceedings and Acts of the General Assembly of Maryland, January 1637/8—September 1664*, at 103 (William Hand Browne, ed., 1883); *Records of the Governor and Company of the Massachusetts Bay in New England* 196 (Nathaniel B. Shurtleff, ed., 1853). At least two colonies also controlled more generally where colonial settlers could transport or sell guns. Connecticut banned the sale of firearms by its residents outside the colony. 1 Trumbull, *Public Records of the Colony of Connecticut*, 138–39, 145–46. And under Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians. Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 336–37 (1823)

873 F.3d at 685. In addition to these colonial laws, the government points to numerous historical statues from the founding-era through the middle of the 19th century that also touch upon the restrictions on the sale of firearms and vital components. *See, e.g.*, William Henry Whitmore, The Colonial Laws of Massachusetts (1890) (regulating unlicensed transportation of gunpowder in 1651); The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City 89 (prohibiting unlicensed sales of gunpowder in Providence, Rhode Island in 1821); 1847 Ind. Acts 93, chap. 61, § 8 (creating regulations and licensing requirements for gunpowder in 1847); Ordinances of the City of Chicago, Ill, ch. 16, Regulating the Keeping and Conveying Gun Powder and Gun Cotton, §§ 1–5 (1851), *reprinted in* George Manierre, The Revised Charter and Ordinances of the City of Chicago 123–25 (1851) (regulating unlicensed sale of gun powder in 1851); Robert Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017) (discussing

1652 New York law outlawing illegal trading of guns, gun powder, and lead by private individuals). These founding-era and reconstruction-era statutes illustrate that at the time the people adopted the Second Amendment, and when it was incorporated to the states, the public understood that the government could restrict the transfer of firearms.[15]

Petersen argues that some of these colonial laws, specifically those which restricted sales of firearms to Native Americans, should be disregarded because they would be unconstitutional today. *See* Petersen's Reply at 6. Petersen's statement is correct that states would not be able to prohibit certain races from purchasing firearms today. *See Drummond*, 9 F.4th at 228 n.8 (noting such race-based exclusions would be unconstitutional in the modern day). But this argument is off the mark as to impact on the statutes' role as a historical analogue.[16] This stage of the inquiry is not to find a "historical twin" that could be replicated in the modern era but rather, to determine whether "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133.

These statutes demonstrate that the public would not understand section 922(a)(5) as an unlawful restriction on the scope of the Second Amendment at the time it was ratified by the people. *See id.* Therefore, the conduct prohibited by section 922(a)(5) falls outside of the Second Amendment's "unqualified command." *See id.* at 2130 (citation and quotation marks omitted). Accordingly, the government has met its burden by presenting relevantly similar historical statutes.

---

[15] This tradition has continued throughout the country's history of firearm regulation. The federal government required dealers to obtain licenses in 1938. *See* Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968) (replaced with Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213). States required licensing for transfers of firearms even earlier than the federal government. *See, e.g.*, 47 Stat. 650, 652 (1932) (establishing licensing requirement for District of Columbia in 1932); 1927 Haw. Sess. Laws 209, 211 (establishing licensing requirement in Hawaii in 1927).

[16] In *Drummond*, the Third Circuit found that the gun regulation at issue was not rooted in the Nation's history of firearm regulation because the historical law would be unconstitutional today. 9 F.4th at 228. The Third Circuit concluded that the historical laws were "not especially close" to the challenged regulation because the "historical rules kept weapons out of the hands of certain *buyers*, while the [challenged statute] . . . aims to reduce *sellers'* commercial gain." *Id.* (emphasis in original). Here, the challenged statute and the historical statutes place limitations on the ability to transfer firearms to specific groups of people. *See id.*

Even if the Second Amendment protects conduct covered by section 922(a)(5), the statute is consistent with this Nation's historical tradition of firearm regulation. *See id.*

### 4. Facial and As-Applied Challenges to § 922(a)(5)

"To prevail on his facial challenge, [Petersen] must 'establish [ ] that no set of circumstances exists under which . . . [§ 922(a)(5)] would be valid, *i.e.*, that the law is unconstitutional in all of its applications.'" *See United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (internal citations and quotations marks omitted). For the reasons stated above, section 922(a)(5) imposes conditions and qualifications on the commercial sale of arms, falls outside the scope of the Second Amendment, and is thus, presumptively lawful. Even if the court reaches step two of *Bruen*, there are sufficient historical analogous to support the court finding that section 922(a)(5) is consistent with this Nation's historical tradition of firearm regulation. Therefore, Petersen's facial challenge fails.

The court turns to Petersen's as-applied challenge. "Unlike a facial challenge, an as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Binderup*, 836 F.3d at 345; *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another.") (internal quotation marks and citation omitted). Here, Petersen and his co-defendants are charged with transporting firearms and transferring them to an individual that they knew or had reasonable cause to believe did not reside in the United States Virgin Islands. *See* Second Superseding Indictment at 3–6. As discussed above, section 922(a)(5) is presumptively lawful as regulations and conditions on the transfer of firearms falls outside the scope of the Second Amendment. There is no evidence that in the instant circumstance, the statute is being applied in

20

a way that infringes on the defendants' Second Amendment right to acquire firearms. *See Teixeira*, 873 F.3d at 677–78 (discussing Second Amendment right to acquire firearms and vital components); *Ezell*, 651 F.3d at 704 (same). Accordingly, Petersen's as-applied challenge also fails.

### B.      Motion to Compel and *Roviaro*

Next the court considers the Joseph's motion to compel the disclosure of the identity of the government's confidential informants. Joseph argues that under *Roviaro v. United States*, 353 U.S. 53 (1957), the government must disclose the identity of their confidential informants. *See* Mot. to Compel Disclosure Under *Roviaro* at 1, Doc. No. 475 ("Mot. to Compel"). In the government's opposition, it responds that *Roviaro* is inapplicable but, even if was, that Joseph fails to meet his burden to compel disclosure. *See* Opp'n to Mot. to Compel Under *Roviaro* ("U.S. Opp'n to Mot. to Compel") at 1–2, 2 n.4, Doc. No. 490. The government is correct on both points.

### 1.      *Roviaro* is Inapplicable

Joseph argues that under *Roviaro*, the government must disclose the identity of several confidential informants. Mot. to Compel at 4–5. The government argues that *Roviaro* is inapplicable to the instant circumstance because the government intends to call the confidential informants at trial. U.S. Opp'n to Mot. to Compel at 1–2.

In *Roviaro*, the defendant was charged and ultimately convicted of selling heroin. 353 U.S. at 55. During the investigation into the sale, the government had used an undercover agent who had been present during the alleged crime and may have been a material witness. *Id.* This undercover agent was never called at trial and his identity was never disclosed. *Id.* The defendant appealed his conviction, arguing that the government needed to disclose the identity of the undercover agent as his testimony could have been highly relevant and helpful to the defense. *Id.* at 63–64.

21

Ultimately, the Supreme Court held that it is the "[g]overnment's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."[17] *Id.* at 59. However, this privilege is not unlimited. *See id.* at 60. If "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61. "The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62; *see also United States v. Jiles*, 658 F.2d 194, 196 (3d Cir. 1981) (applying *Roviaro*).

In *United States v. Casseus*, 282 F.3d 253, 257 (3d Cir. 2002) the Third Circuit analyzed the scope of this privilege. In *Casseus*, the appellant-defendants argued that pursuant to *Roviaro*, the district court should have required the government to disclose the identity of an eyewitness earlier than it did. *Id.* Reviewing the facts, the Third Circuit held that *Roviaro* was inapplicable because *Roviaro* and *Jiles* "address the duty of the prosecution to disclose the identity of confidential informants who *will not testify*." *Id.* at 257 (emphasis added). The witnesses at issue in *Casseus* had testified at trial and the appellant-defendants had been allowed to interview the witnesses before trial. *Id.* The court explained that when a confidential witness does not have "evidence favorable to the accused" and the government plans to call the confidential witnesses at trial, *Roviaro* is not appropriate.[18] *See id.* Here, the government plans to call the confidential informants at trial. *See* U.S. Opp'n to Mot. to Compel at 1 ("The United States intends to call each of those informants to testify at trial.").

---

[17] The court reasoned that this privilege serves the public interest by encouraging citizens to assist law enforcement. *Roviaro*, 353 U.S. at 59.

[18] When a witness does have evidence favorable to the accused, the prosecutor has an affirmative duty to disclose the evidence pursuant to *Brady v. Maryland*, 337 U.S. 83 (1963).

Here, the appropriate standard is therefore Federal Rule of Criminal Procedure 26.2. "Pursuant to the Jencks Act, implemented by Federal Rule of Criminal Procedure 26.2, any time that a government witness testifies on direct examination, the defendant is entitled to a copy of 'any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.'"[19] *United States v. Maury*, 695 F.3d 227, 247 (3d Cir. 2012) (quoting 18 U.S.C. § 3500(b)(2)). When a confidential informant will be called at trial, the prosecution is not required to disclose the eyewitness identity until the eve of trial. *See United States v. Romain*, No. 13-724, 2014 WL 1410251, at *4 (S.D.N.Y. Apr. 11, 2014) ("[T]he Government, in accordance with common practice, will provide all such materials on the Friday before the start of trial. Such notice is sufficient under the applicable law.").

Here, the government states that multiple confidential informants' identities have not yet been disclosed. *See* Opp'n to Mot. to Compel at 1. The government intends to call these informants to testify at trial and will, in accordance with common practice, disclose the identity of the informants and produce the relevant *Gigio* material the Friday morning before trial.[20] *See id.* at 4. As discussed above, because the government intends to call the witnesses at trial, *Roviaro* is

---

[19] The Third Circuit continued, explaining that:

> Provided the government contests the relevance of any portion of the statement, it must submit the entire statement to the court for in camera review. *Id.* § 3500(c). A "statement" is defined as (1) any written statement made and signed or adopted by the witness; (2) a "stenographic, mechanical, electrical, or other recording, or a transcription thereof" that recites "substantially verbatim", and was made contemporaneously with, the witness's statement; or (3) a recording or transcript of grand jury testimony. *Id.* § 3500(e). The purpose of Jencks disclosure is to provide the defendant with an opportunity to review the witness's statements for any possible inconsistencies that he might use to impeach the witness. *United States v. Rosa*, 891 F.2d 1074, 1076–77 (3d Cir.1989).

*Maury*, 656 F.3d at 247–48.

[20] "*Gigio* material . . . is a subset of *Brady* material insofar as it addresses situations in which certain evidence about a witness's credibility or motivation to testify exists, and where 'the reliability of a given witness may well be determinative of guilt or innocence.'" *Maury*, 695 F.3d at 249 (quoting *Gigio v. United States*, 405 U.S. 150, 154 (1972)). Like *Brady* material, the government has an obligation to disclose *Gigio* material but not until the eve of trial. *See id.*

inapplicable.[21] *See Casseus*, 282 F.3d at 257 ("[A]ppellants' reliance on *Roviaro v. United States*, 353 U.S. 53, 77 S. Ct. 623, 1 L.Ed.2d 639 (1957) and *United States v. Jiles*, 658 F.2d 194 (3d Cir.1981), is inappropriate. These cases address the duty of the prosecution to disclose the identity of confidential informants who *will not testify*.") (emphasis added). The prosecution must comply disclosure requirements under *Giglio* and *Brady* but is not presently required to disclose the identity of the confidential informants.

### 2.    Even Under *Roviaro*, Disclosure is Not Warranted

Even if *Roviaro* was applicable, the court would still deny Joseph's motion to compel the identity of the confidential informants. In *Jiles*, the Third Circuit discussed relevant factors for courts in the circuit to weigh when considering whether to grant a motion to compel under *Roviaro*. 658 F.2d at 196–97. The court explained that there is no "fixed rule" for when disclosure of a confidential informant is required. *Id.* at 196. Rather, courts should follow a two-step approach.[22] *See id.* First, the defendant must make a showing of specific need. *Id.* The showing must be based

---

[21] On April 4, 2023, the court held a motions hearing on all outstanding motions. During discussion of the motion to change vicinage, the government presented testimony from law enforcement agents working with several of the undisclosed confidential informants to argue the trial should be held in the division of St. Thomas and St. John. At the hearing, the defendants argued that this testimony should be considered testimony by the informants and this their identities must be disclosed. Under the Jencks Act, 18 U.S.C. § 3500, the government must produce the prior statement of a government witness after the witness testifies on direct examination. Federal Rule of Criminal Procedure 26.2 implements the Jencks Act and sets forth procedures for applying it. 26.2(g) details the scope of the rule, explaining that the rule applies to a: (1) Fed. R. Crim. P. 5.1(h) - preliminary hearings; (2) Fed. R. Crim. P. 32(i)(2 – sentencing; (3) Fed. R. Crim. P. 32.1(e) - hearing to revoke or modify probation or supervised release; (4) Fed. R. Crim. P.46(j) – a detention hearing; or (5) Rule 8 of the Rules Governing Proceedings under 28 U.S.C. §2255. In addition, Federal Rule of Criminal Procedure 12(h) states that Rule 26.2 applies at a suppression hearing. The April 4, 2023 hearing does not fit any of these categories and thus, is not required to disclose their informants' identities.

[22] Joseph suggests that the court should, as a threshold matter, determine whether the informant is a material witness. *See* Mot. to Compel at 3–4. Joseph asserts that if the informant is a material witness, the court must compel disclosure. *See id.* Joseph cites to a single case from the District of Nebraska to support this approach. Reviewing the relevant caselaw in the Third Circuit, the court is not convinced that it must follow such procedure. Rather, the framework provided by the Third Circuit in *Jiles,* and its progeny, are the appropriate standard. Moreover, Joseph argues that *United States v. Ross*, No. 05-398-1, 2006 WL 938535 (E.D. Pa. Apr. 4, 2006) compels disclosure. *See id.* at 3. Joseph quotes portions of the opinion in which the court discusses *United States v. Fuentes*, 988 F. Supp. 861 (E.D. Pa. 1997). *See id.* In *Fuentes*, the government intended to present the informant's testimony at trial but refused to disclose the informant's identity. 988 F. Supp. at 862. The week before trial, the court held that the government must disclose the identity of the informant. Here, the government has stated that it will disclose the identity of their confidential informants during the week before trial. U.S. Opp'n to Mot. to Compel at 4–5. Therefore, *Ross* and *Fuentes* are consistent with the outcome of the instant motion.

on more than just "mere speculation" of the usefulness of the informant's testimony. *See id.* at 197; *see also United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (holding vague assertions of usefulness insufficient in motion to compel identity of informant).

To find specific need, courts must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Jiles*, 658 F.2d at 196 (quoting *Roviaro,* 353 U.S. at 62). Factors to consider depend on the "particular circumstances of the case" and include "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* A defendant seeking to compel disclosure ultimately bears the burden of showing that fairness outweighs the government's privilege. *Id.* at 197.

After meeting the burden to show a specific need, the court balances the defendant's interest in disclosure against "the Government's interest in maintaining the confidentiality of its informant." *Id.* at 198. Under this test, the informant's identity should be disclosed where: "(1) the possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the accused, in the transaction charged." *Id.* at 198–199. However, even when the information provided by a confidential informant may be significant for a defendant's defense, a court may deny a motion to compel when there is a threat of danger to the confidential informant. *See id.* at 199 (denying motion to compel disclosure in part because the court "cannot jeopardize the life or safety of an informant to guarantee the success of appellee's trial tactics."). Further, a motion to compel can be denied if revealing the identities could create future hesitance among citizens in their obligation to report their knowledge of crimes. *See Roviaro,* 353 U.S. at 59 (recognizing privilege to withhold informants' identity encourages informants to provide information to law enforcement).

Here, Joseph fails to show specific need. *See Jiles*, 658 F.2d at 196. The confidential informants may have information that may help the defendants prepare their defense. *See id.* However, Joseph fails to demonstrate that his interest outweighs the public interest in protecting the flow of information. *See id.* The defendants are charged with numerous counts relating to illegal trafficking of drugs, firearms; and two of the defendants are charged with murder. *See generally* Second Superseding Indictment. These charges could reasonably imply the defendants are potentially dangerous and create a chilling effect on witnesses' desire to publicly cooperate with law enforcement. *See Jiles*, 658 F.2d at 196. In addition, Joseph does not contend that these are the only witnesses to the crime other than the accused. *See* Mot. to Compel at 1–5. The identities of these confidential informants do not appear to be vital to Joseph's preparation of his defense or to be essential to a fair determination of the case. *See Jiles*, 658 F.2d at 196. Accordingly, the court does not find Joseph has met his burden to show specific need.

Moreover, at step two, the balance of disclosing the confidential informants' identity against the government's interest in maintaining the confidentiality of the informants favors non-disclosure. While the information may assist the defendants, there is no evidence given that the informants have critical or unique information regarding the crime. *Id.* Unlike in *Roviaro*, where the informant was a sole witness to the crime, here there are a number of other witnesses able to help Joseph prepare his defense. *See* 353 U.S. at 64. Much like in *Jiles*, disclosure could put the informants and their families in a danger, especially those that still reside on St. Croix. *See* 658 F.2d at 198–199. Concealing their identities until the eve of trial is the best way to protect the public interest while also permitting the defendants to prepare a meaningful defense. *See id.* at 199 (denying motion to compel disclosure of confidential informant's identity due to credible safety concerns). Thus, even if *Roviaro* was applicable, after balancing the relevant factors, the weight

favors non-disclosure. Accordingly, the court will deny Joseph's motion to compel disclosure under *Roviaro*.

## IV.    CONCLUSION

For the reasons stated above, the court will deny the motion to dismiss counts five through ten of the second superseding indictment and Joseph's motion to compel disclosure.

The court will enter separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.[23]

---

[23] The Honorable Edward G. Smith, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.